IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LEEANN WILSON                          )
                                       )
          Plaintiff,                   )
                                       )
vs.                                    )          No.  3:13-CV-1304-N (BH)
                                       )
CAROLYN W. COLVIN, ACTING              )
COMMISSIONER OF THE SOCIAL             )
SECURITY ADMINISTRATION,               )
                                       )
          Defendant.                   )          Referred to U.S. Magistrate Judge

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court is *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed July 2, 2013 (doc. 12).  Based on the relevant filings, evidence, and applicable law, the case should be **REVERSED** and **REMANDED** to the Commissioner for further proceedings.

# I.  BACKGROUND[1]

## A.    Procedural History

Leeann Wilson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  (R. at 1–3.)  On February 28, 2011, Plaintiff applied for DIB, alleging disability beginning August 3, 2010, due to a broken ankle with bone fusion, osteoporosis, and hypertension.  (R. at 112–20, 155.)  Her application was denied initially and upon

---

[1]    The background information comes from the transcript of the administrative proceedings, which is designated as "R."

reconsideration.  (R. at 58–62, 68–71.)  She timely requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing held on March 6, 2012. (R. at 19–45.)  On March 15, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 10–15.)  The Appeals Council denied her request for review on May 10, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.)   She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (doc. 1.)

**B.**  **Factual History**

**1.**  **Age, Education, and Work Experience**

Plaintiff was born on October 7, 1965, and was 46 years old at the time of the hearing before the ALJ.  (R. at 23, 56.)  She completed high school and has no past relevant work.  (R. at 15, 23.)

**2.**  **Medical Evidence[2]**

On August 10, 2010, Plaintiff presented to Texas Orthopaedic [*sic*] Associates for a consultation regarding her "severe left ankle pain."  (R. at 227.)  She told William R. Vandiver, M.D., the examining physician, that she broke her ankle in 1998 when she "fell on some ice in a snow storm."  (*Id.*)  She also told Dr. Vandiver that she underwent surgery following her ankle fracture.  (*Id.*)  Plaintiff complained of having "constant pain in her ankle with ambulation."  (*Id.*)  Upon examination, Dr. Vandiver found that she "ha[d] a lot of swelling and some mild deformity . . . possibly due to osteophyte formation."  (*Id.*)  He found that she had "no clinical instability of the ankle" and was "otherwise neurovascularly intact in her left lower extremity."  (R. at 228.)  Recent X-rays revealed "severe post traumatic degenerative changes in the left ankle with bone on bone contact in several weight-bearing areas as well as extensive osteophyte formation."  (*Id.*)  Due

---

[2]  The resolution of this action involves Plaintiff's physical impairments and the record contains no psychological or psychiatric evidence.

to "the severity" of her condition, he did not "consider doing injections or other simpler treatments," but instead referred her to "Dr. John Early," "an orthopedic foot and ankle specialist." (*Id.*)

On September 24, 2010, Dr. Early performed a "left ankle fusion." (R. at 229.) His pre-operation diagnoses were arthritis, equinus deformity, and severe medial pain. (*Id.*) Plaintiff saw Dr. LaFon at Texas Orthopaedic for a post-surgery follow-up on October 7, 2010. (R. at 224.) She was "doing well," her pain was "controlled," and she "ha[d] no complaints." (*Id.*) Six weeks after her surgery, she continued doing well and her pain was under control. (R. at 223.)

By late November 2010, Plaintiff's left foot was "very painful" and felt "like it [was] on fire every time she [took a] step[]." (R. at 221.) She told Dr. LaFon that the pain occasionally woke her He's up at night. (*Id.*) Tylenol did "not seem to [ease] the pain." (*Id.*) Dr. LaFon noted that she had decreased sensation on the bottom of her left foot compared to her right foot and "ha[d] some slight hypersensitivity" as well. (*Id.*) He opined that her pain was "neurogenic in order," prescribed her Lyrica to ease the pain, and recommended "massage therapy" to "help desensitize the nerve." (*Id.*) The following month, Plaintiff was "still having a lot of pain [in] her ankle" and felt a burning sensation on the bottom of her left foot. (*Id.*) Dr. LaFon opined that her pain was "secondary to nerve irritation" and referred her to physical therapy. (*Id.*)

On January 18, 2011, Plaintiff saw Dr. Early and reported "doing much better" as a result of the physical therapy. (R. at 219.) A physical examination revealed no "real erythema, edema, or ecchymosis" in her left foot. (*Id.*) X-ray images "show[ed] solid ankle fusion." (*Id.*) According to Dr. Early's notes, "[t]he major problem [was] her return to work." (*Id.*) He opined that it would "probably" "be 3 or 4 more months before she" could return to her job at the Auto Zone warehouse, where she was required to "walk[] and go[]up and down stairs" for up to 12 hours a day. (*Id.*) He opined that she could engage in only "sedentary work." (*Id.*)

Plaintiff saw Dr. Early again on March 22, 2011, "for a long-term" follow-up.  (R. at 217.) By this time, she was six "months out from ankle fusion and [was] doing well."  (*Id.*)  She could engage her left foot in "[f]ull weightbearing" but had "some discomfort by the end of the day."  (*Id.*) Dr. Early considered it "impractical" for Plaintiff to return to her job at Auto Zone, where she was on her feet, "lifting and transferring parts up and down [stairs] [for] 10 to 12 hours a day."  (*Id.*)  He released her "for sedentary work at [that] point," finding that "her foot appear[ed] to be stable in its healed position."  (*Id.*)  He opined that engaging in "[a]nything much more than sedentary work [would] continue to create significant discomfort in her foot," and that she needed to gear up her physical activity to see if she could tolerate wearing the steel-toed shoes that her job at Auto Zone required.  (*Id.*)  Lastly, he recommended that she "[c]ontinue in physical therapy."  (*Id.*)

On April 13, 2011, Patty Rowley, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records and completed a physical Residual Functional Capacity (RFC) assessment.  (R. at 232–39.)  She determined that Plaintiff's primary diagnosis was "status post left ankle fusion" and her secondary diagnosis was "arthritis of ankle."  (R. at 232.)  She opined that Plaintiff had no exertional, postural, visual, communicative, or environmental limitations.  (R. at 233–37.)  In reaching these findings, she acknowledged Plaintiff's left ankle fusion on September 24, 2010.  (R. at 239.)  She noted Plaintiff's progression "from using crutches, to [using] a cast, to [wearing] a brace."  (*Id.*)  Dr. Rowley also considered important Plaintiff's willingness to return to work and Dr. Early's observations on March 22, 2011, that she was "fully able to bear weight on her left foot," that "her condition [was] improving," and that she was "responding well to therapy." (*Id.*)  She concluded that Plaintiff's allegations were partly supported by the evidence of record and that her impairments were not expected to last for 12 months.  (*Id.*)

On April 14, 2011, Susan Kaku, P.T., a physical therapist at Baylor Institute for

Rehabilitation, noted that the swelling around Plaintiff's left ankle was "minimal" and she had less tenderness and "more normalized muscular tone." (R. at 256.) Plaintiff could stand and walk longer "without increased pain." (*Id.*) The following week, Plaintiff had less pain while walking and standing and her ability to engage in daily living activities had also improved. (R. at 259.) She still experienced "stiffness" in her ankle, especially with weather changes. (*Id.*)

By the end of May 2011, Plaintiff still had muscle stiffness around her ankle that caused her to "have [a] much more antalgic gait." (R. at 290.) She elevated her foot at night and "as often as she [could]" to reduce the swelling. (*Id.*) Ms. Kaku opined that Plaintiff had a "significant biomechanical deformity" that could "improve with an appropriate orthotic [treatment] to control [her] abnormal motion and to balance [her] weight bearing" and recommended four more weeks of therapy. (R. at 298.) Plaintiff's tolerance for standing and walking remained less than one hour. (*Id.*) She could do minimal lifting and had "[s]ignificant difficulty with low sit to stand [exercises] and squatting." (*Id.*) She also had difficulty taking "higher steps" with her left foot. (R. at 303.)

Plaintiff saw Ms. Kaku again on June 9, 2011, and told her that she still felt a burning sensation on her left foot, and her endurance for walking and standing remained "limited." (R. at 312.) Treatment notes from June and July 2011 show that Plaintiff repeatedly reported numbness, stiffness, hypersensitivity, and paresthesias in her left foot. (*See, e.g.*, R. at 336 –38, 353–75.) On July 21, 2011, Plaintiff rated her pain at 6 on a 10-point scale and explained that it was at its worst when she walked, stood, or squatted. (R. at 379.)

On August 17, 2011, Randal Reid, M.D., another SAMC, reviewed Plaintiff's medical record and completed a physical RFC assessment. (R. at 339–46.) His primary diagnoses were left ankle open reduction and internal fixation surgery (ORIF). (R. at 339.) He opined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and

walk for at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight with hand and foot controls; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and no manipulative, visual, communicative, or environmental limitations.  (R. at 340–44.)  In his observations, he noted Plaintiff's left ankle fusion in September 2010 and Dr. Early's notations the following month that she was "overall doing well."  (R. at 346.)  He referenced Dr. Early's notes from March 22, 2011, indicating that Plaintiff wanted to return to her job at Auto Zone, and Dr. Early's opinion that she would "need to wait for this type of work."  (*Id.*)  He concluded that Plaintiff's allegations were "mostly credible."  (*Id.*)

Plaintiff was discharged from physical therapy on September 8, 2011, due to her insurance limitations.  (R. at 374.)  She was "now able to walk [for] 45 min[utes] without increased paresthesias [or] burning" and could take higher steps "but not on a repetitive basis."  (*Id.*)  Ms. Kaku opined that she "would further benefit from additional [physical therapy] to improve [her] standing, walking, balancing tolerance," and eventually "be able to resume work[]."  (*Id.*)

Throughout the relevant time period, Plaintiff visited the Kaufman Community Health Center, her primary healthcare provider.  (R. at 409–68.)  Although some of her visits related to her foot injury and rehabilitation, most visits related to the management of her weight, cholesterol, and blood pressure.  (*See* R. at 439 –51.)

### 3.    Hearing Testimony

On March 6, 2012, Plaintiff testified at a hearing before the ALJ.  (R. at 21–44.)  Plaintiff was represented by an attorney.  (R. at 21.)

Plaintiff testified that she was 46 years old, had a high school diploma, was divorced, and had no children under 18.  (R. at 23.)  She measured five feet seven inches and weighed 240 pounds.

(R. at 24.) This was not her normal weight, however; she had gained over 50 pounds since her ankle fusion surgery because of her inability to exercise. (*Id.*)

Plaintiff stopped working on August 3, 2010, after she injured her left foot at work when she "made a wrong step." (R. at 25, 29.) She last worked at an Auto Zone distribution center picking up auto parts and moving them around the warehouse for 10 to 12 hours a day. (R. at 25.) The heaviest weight she lifted was 40 to 50 pounds. (*Id.*) She worked there for five years. (*Id.*)

Before that, Plaintiff worked for the Kaufman Independent School District (KISD) as a cook, kitchen supervisor, and packer. (*Id.*) Those jobs required her to stand on her feet all day and lift between 20 to 25 pounds. (R. at 26.) She worked for KISD "on and off" between 1990 and 2000. (*Id.*) During the same time period, she also worked intermittently for a glass company "receiving and returning" coffee mugs and glasses. (R. at 27.) In this job, she walked a lot and lifted between 30 to 35 pounds. (*Id.*)

Currently, Plaintiff could not work "[b]ecause of the strain on [her] ankle where [she] had the fusion done." (*Id.*) The problem began when she broke her left ankle in 2000. (R. at 28.) She underwent three surgeries since then to have "hardware and screws . . . put in there." (*Id.*) She was able to work after her surgeries, but the doctors told her that she would develop "crippling arthritis" "in the years to come." (R. at 28–29.)

Between 2003 and 2010, Plaintiff experienced swelling and numbness in her left ankle that made it difficult to walk and stand. (R. at 29.) Dr. Early, her orthopedic surgeon, performed a "fusion" and "took the hardware out" of her ankle on September 24, 2010. (R. at 30–31.) The procedure did not alleviate her symptoms, as she continued having swelling, tingling, numbness, and "plenty of pain" in her left foot. (R. at 31.) Dr. Early prescribed her pain medication and told her to keep her foot elevated to keep the weight off and reduce the swelling. (*Id.*) She saw Dr. Early

about once a month. (*Id.*) After six months of being under his care, he referred her to physical therapy, stating that he had done "all he could." (*Id.*)

Plaintiff went to physical therapy three times per week. (R. at 33.) In therapy, they put her foot in a "boot" and connected it to a machine that "froze" the nerves to reduce the swelling. (*Id.*) They also taught her "how to walk and hold [the] weight on [her] foot." (*Id.*) At home, she sat in her recliner with her foot elevated for at least 2 hours a day. (*Id.*) She spent between 5 and 6 hours a day lying on her bed and stacked 5 pillows under her foot to keep it elevated. (*Id.*) Her physical therapist recommended that she use a cane "to help with the weight and the balance on [her] left ankle." (R. at 36–37.)

Plaintiff stopped going to physical therapy in September 2011 because she reached her insurance limits. (R. at 36.) At that point, she was still unable to work and continued experiencing swelling in her ankle. (*Id.*) Her doctor prescribed her ibuprofen for her pain, and it helped a "little bit." (R. at 37.) She did not drive when she took it because it caused her dizziness and nausea. (R. at 37–38.) Her pain level was constant and "extreme," about a 10 on a 10-point scale. (R. at 38.)

In addition to her foot injury, Plaintiff suffered from carpal tunnel syndrome in her right hand, diabetes, and high blood pressure. (R. at 27–28.) She checked her blood sugar level once a day in the morning, and it was usually between 130 and 140. (*Id.*) The medication she took for her blood pressure made her go to the bathroom "every 30 minutes or so." (R. at 40.)

Plaintiff could walk for only one block before her foot began to hurt. (*Id.*) The longest she could stand was about one hour. (*Id.*) She could sit for about one hour with her leg stretched out in front of her. (*Id.*) Her daughter helped her with the house chores, cooked, cleaned, did the laundry, and helped her bathe. (R. at 41.) Plaintiff did not go grocery shopping. (*Id.*) She often

drove to a convenience store to buy bread, milk, and sugar, and drove to church twice a week.  (*Id.*) She had no hobbies and was not involved in any community organizations.  (R. at 43.)

C.   **ALJ's Findings**

The ALJ issued his decision denying benefits on March 15, 2012.  (R. at 10–15.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since August 3, 2010, her alleged onset date.  (R. at 12.)  At step two, he found that Plaintiff had two severe impairments: status post left ankle fusion and arthritis of the ankle.  (*Id.*) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that satisfied the severity criteria of any impairment listed in the social security regulations.  (R. at 13.)

Before proceeding to step four, the ALJ determined that Plaintiff had the physical RFC to perform "the full range of light work as defined in 20 C.F.R. § 404.1567(b)."  (*Id.*)  At step four, the ALJ found that Plaintiff had no past relevant work.  (R. at 14.)  At step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (R. at 15.)  Accordingly, the ALJ determined that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between her alleged onset date and the date of the ALJ's decision.  (*Id.*)

## II.  ANALYSIS

A.   **Legal Standards**

1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether there is substantial evidence to support the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is

disabled:

> 1.   An individual who is working and engaging in substantial gainful activity
>      will not be found disabled regardless of medical findings.
>
> 2.   An individual who does not have a "severe impairment" will not be found
>      to be disabled. If the individual is found to have severe impairment, then
>      step three should be considered.
>
> 3.   An individual who "meets or equals a listed impairment in Appendix 1" of
>      the regulations will be considered disabled without consideration of
>      vocational factors. If the individual does not meet listed impairment, step
>      four should then be considered.
>
> 4.   If an individual is capable of performing the work he has done in the past,
>      a finding of "not disabled" must be made. If unable to perform such work,
>      an RFC determination should be made and step five should be considered.
>
> 5.   If an individual's impairment precludes him from performing his past
>      work, other factors including age, education, and past work experience
>      must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R.

§ 404.1520(b)–(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)–(v) (2012)). Under the first four steps

of the analysis, the burden lies with the claimant to prove disability in the relevant time period.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his

or her burden under the first four steps, the burden shifts to the Commissioner at step five to show

there is other gainful employment available in the national economy that the claimant is capable of

performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the

Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3.      Standard for Finding of Entitlement to Benefits

In the alternative to remand, Plaintiff asks the Court to reverse the case and "find that she is disabled and entitled to a period of disability and to disability insurance benefits." (Pl. Br. at 14.)

If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted).  The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  Inconsistencies and unresolved issues in the record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).

### B.      Issues for Review

Plaintiff presents four issues for review:

(1)      Did the Commissioner properly consider medical opinion evidence? The Plaintiff contends that the answer is "No.";

(2)      Did the ALJ consider all of Plaintiff's severe impairments and functional limitations in establishing her residual functional capacity?;

(3)      Did the Commissioner properly utilize the vocational rules of the Commissioner's Appendix 2 to establish the existence of work which Plaintiff can perform?  The Plaintiff asserts that the answer is "No."; [and]

- 12 -

(4)    Did the Commissioner properly evaluate [the] credibility of the Plaintiff?  The Plaintiff asserts that the answer is "No."

(Pl. Br. at 1.)

## C.    <u>Medical Opinion Evidence</u>

Plaintiff first contends that the ALJ erred in determining her physical RFC because he failed to properly consider the treating opinions of Dr. Early, her orthopedic surgeon, as well as the consultative RFC assessments of Dr. Rowley and Dr. Reid, the state agency medical consultants. (Pl. Br. at 8–9.)

### 1.    *Dr. Early's Opinions (Treating Physician Rule)*

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § § 404.1520(b) and 404.1527(c).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.[3] 20 C.F.R. § 404.1527(c)(2).  If the treating physician is a specialist, his opinion "generally is accorded greater weight than that of a non-specialist." *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).  When "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight.  *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(c)(2)).  If controlling weight is not given to a treating source's opinion, the Commissioner generally applies six factors in deciding the weight given to this and all other

---

[3]  A treating source is the claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502 (2012).

medical opinion evidence in the record.[4]  *Id.*

Nevertheless, a treating physician's opinion may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455–56.  A factor-by-factor analysis is also unnecessary where "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have *treated or examined* the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458 (emphasis added).

Here, the ALJ determined that Plaintiff had the physical RFC "to perform the full range of light work" as defined by 20 C.F.R. § 404.1567(b).[5]  (R. at 13.)  In determining Plaintiff's RFC, the ALJ acknowledged her left ankle fusion on September 24, 2010, and her hearing testimony that even after the surgery "she was not better" and "still had swelling, numbness, tingling, and pain."  (R. at 14.)  He also considered Plaintiff's alleged symptoms "and the extent to which [they] could reasonably be accepted as [being] consistent with the objective medical evidence."  (*Id.*)  He concluded that her statements regarding her pain level of 10 on a 10-point scale (i.e., "extreme") and

---

[4]  These factors are: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  20 C.F.R. § 404.1527(c)(1)–(6).

[5]  The applicable regulation defines "light work" as:
[W]ork [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.
20 C.F.R. § 404.1567(b).

other symptoms were not credible because they conflicted with her reports to Ms. Kaku (her physical therapist) on July 21, 2011, that her pain level was 6 of 10, as well as with Ms. Kaku's observations that she was "capable of walking on uneven surfaces without pain or parathesias." (R. at 13, 379.)

In his step two discussion regarding Plaintiff's severe impairments, the ALJ referenced Dr. Early's March 22, 2011 notations that Plaintiff "was six months removed from [her] ankle fusion and [was] doing well." (R. at 13, 217.) He found important Dr. Early's opinion that Plaintiff "was full weight bearing and was released to sedentary work[6] while continuing physical therapy." (*Id.*) On that occasion, Dr. Early also opined that Plaintiff's return to her job at Auto Zone depended on her tolerance to wear steel-toed shoes, which were required to perform the work. (R. at 217.) He also considered it "impractical" for Plaintiff to engage in that type of work in the long-run given her inability to stand and walk for up to 12 hours a day. (*Id.*) He concluded that engaging in "[a]nything much more than sedentary work [would] . . . create significant discomfort in her foot." (*Id.*)

Notably, Dr. Early's opinions regarding Plaintiff's standing limitations and her inability to perform more than sedentary work were not contradicted by any other treating or examining physician. His opinions were supported by Ms. Kaku's observations during Plaintiff's physical therapy sessions. On May 5, 2011, for instance, Ms. Kaku noted that Plaintiff had "limited" standing and walking endurance. (R. at 278.) By the end of May, Ms. Kaku opined that Plaintiff's tolerance for standing and walking was less than one hour. (R. at 298.) On July 2, 2011, Plaintiff

---

[6] If the claimant can do light work, "he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Id.* § 1567(a). Although sedentary work "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.*

could stand for only 20 minutes before needing to sit down.  (R. at 353.)  When Plaintiff was released from physical therapy in September 2011 due to her insurance limitations, the longest she could walk "without increased paresthesias [or] burning" was 45 minutes.  (R. at 374.)  During the last physical therapy session on file, Ms. Kaku opined that Plaintiff "would further benefit" from additional physical therapy to improve her standing, walking, and balance tolerance.  (*Id.*)  Although Ms. Kaku's opinions and treating observations were not "medical opinion evidence,"[7] they were "relevant medical and other evidence" that the ALJ was required to consider in determining Plaintiff's RFC.  *See* 20 C.F.R. § 404.1545(a)(3) (providing that an individual's RFC is assessed "based on all of the relevant medical and other evidence").

Because Dr. Early's opinions were not conclusory, were not controverted by first-hand medical evidence, and were supported by the record, the ALJ was required to perform the six-factor analysis of 20 C.F.R. § 404.1527(c)(1)–(6) before rejecting those opinions.  *See Newton*, 209 F.3d at 453–55.  Instead, the ALJ rejected them without discussion by finding that Plaintiff could perform the full range of light work, which requires the capacity to stand and walk for at least 6 hours in an 8-hour workday.  (*See* R. at 13); *see also* 20 C.F.R. § 404.1567(b).  By failing to properly evaluate Dr. Early's treating opinions under 20 C.F.R. § 404.1527(c), the ALJ committed legal error.  *See Harris v. Astrue*, No. 3:11–CV–1089–M–BH, 2012 WL 4442303, at *13 (N.D. Tex. Sept.7, 2012), *rec. adopted*, 2012 WL 4458405 (N.D. Tex. Sept. 26, 2012) (finding legal error where the ALJ implicitly rejected a treating physician's opinions and failed to find good cause or conduct a factor-by-factor analysis under 20 C.F.R. §§ 404.1527(c) and 416.927(c)); *see also Bornette v. Barnhart*,

---

[7]  As a physical therapist, Ms. Kaku was not an "acceptable medical source."  *See* 20 C.F.R. § 404.1513(d) (2011) (providing a non-exhaustive list of non-medical sources, which includes "therapists" and "counselors"); Social Security Ruling (SSR) 06–03R, 2006 WL 2329939, at *2 (S.S.A. 2006) ("non-medical sources" include "therapists").

466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (violation of a regulation constitutes legal error).

Nevertheless, the Court must still consider whether the ALJ's error was harmless. *See Harris*, 2012 WL 4442303, at *14–15 (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion evidence). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

At step four of the sequential evaluation process, the ALJ found that Plaintiff had no relevant past work. (R. at 14.) Accordingly, at step five, the ALJ referenced the Commissioner's medical-vocational guidelines or grids (Guidelines or Grids) to make a disability determination.[8] (R. at 15.) Considering Plaintiff's physical RFC to perform the full range of light work with no additional limitations, combined with her age, education, and work experience, the ALJ concluded that she was not disabled because there were jobs existing in significant numbers in the national economy that she could perform. (*Id.*) If the ALJ had properly considered Dr. Early's opinion that Plaintiff could perform only sedentary work given her limited ability to stand and walk for extended periods of time, he might have accepted that opinion and incorporated some standing and walking restrictions in Plaintiff's physical RFC. Had the ALJ thereby concluded that Plaintiff could not perform the full

---

[8] At step five, the burden shifts to the Commissioner to show "that there is other gainful employment available in the national economy that the claimant is capable of performing." *Yanez v. Colvin*, No. 3:12–CV–1796–K, 2013 WL 4766836, at *8 (N.D. Tex. Sept.5, 2013) (citing *Greenspan*, 38 F.3d at 236). To guide this determination, the Commissioner promulgated the Guidelines. 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). The Guidelines are divided into age categories and the determination of whether an individual is presumptively disabled depends on the claimant's age combined with certain vocational factors. *See id.* If the claimant's impairments are solely exertional, or her nonexertional impairments do not sufficiently affect her RFC, the Commissioner may rely exclusively on the Guidelines to make a step five determination. *Newton*, 209 F.3d at 458. On the other hand, "[w]here a claimant cannot perform the full range of a specific level of work activity or has significant nonexertional impairments, the ALJ may not mechanically apply the Grids." *Rivera v. Astrue*, No. CIV.A.6:08–CV–075–C, 2010 WL 711717, at *4 (N.D. Tex. Mar. 2, 2010). In that case, the ALJ must "make an individualized determination of the claimant's ability to perform specific jobs in the national economy" by obtaining testimony from a vocational expert (VE). *Id.*; *Yanez*, 2013 WL 4766836, at *8.

range of light work, he would not have relied exclusively on the Grids at step five and would have solicited testimony from a VE regarding Plaintiff's ability to perform specific jobs in the national economy. *See Rivera*, 2010 WL 711717, at *4; *Yanez*, 2013 WL 4766836, at *8. In sum, it is not inconceivable that the ALJ would have reached a different disability determination had he properly considered Dr. Early's treating opinions. Remand is therefore required on this basis.

### 2. *SAMCs' (Consultative) Opinions*

State agency medical consultants (SAMCs) such as Dr. Rowley and Dr. Reid are considered experts in Social Security disability determination and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B BH, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *rec. adopted*, 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). Although the ALJ is solely responsible for assessing the claimant's RFC, in making this assessment, she must consider any opinion by an SAMC regarding the claimant's RFC. SSR 96–6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996). Specifically, "RFC assessments by [SAMC's] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors . . . for considering opinion evidence" outlined in 20 C.F.R. § 404.1527(c). *Id.* If the ALJ does not give controlling weight to a treating physician's opinion, he "must explain in [his] decision the weight given to the opinions of a [SAMC] . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining source." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003); *see also* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors

in deciding the weight we give to any medical opinion."). The ALJ is not required to expressly discuss each finding by an SAMC or discuss each factor listed in 20 C.F.R. § 404.1527(c), however, because such a detailed analysis applies only to the ALJ's rejection of a treating source's uncontradicted opinion. *See Newton*, 209 F.3d at 456–58.

In the section relating to Plaintiff's physical RFC, the ALJ's opinion does not mention Dr. Rowley's April 13, 2011 or Dr. Reid's August 17, 2011 consultative RFC assessments. (*See* R. at 14–15.) However, in his step two discussion relating to Plaintiff's severe impairments, the ALJ did reference Dr. Rowley's opinion that Plaintiff had no exertional, postural, visual, communicative, or environmental limitations. (R. at 13, 233–37.) Similarly, the ALJ's opinion states that Dr. Reid concluded that Plaintiff "was limited to light work reduced by an only occasional ability to perform any or all postural maneuvers." (R. at 13.) In his RFC assessment, Dr. Reid did not reference a specific exertional level, but checked only the boxes indicating that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand and walk for "at least 2 hours in an 8-hour workday," could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (R. at 340–41.)

As seen from the record, neither consultant stated that Plaintiff was limited to light work. (*See* R. at 233–37, 340–41.) Moreover, Dr. Reid's opinions regarding Plaintiff's physical limitations do not necessarily correlate with an ability to perform light work. *See* 20 C.F.R. § 404.1567(a)–(b); *see also Zaucha v. Astrue*, No. C 11-03344 HRL, 2013 WL 2422621, at *5 (N.D. Cal. June 3, 2013) (noting that a medical consultant "concluded that [the claimant] was limited to a *sedentary* RFC, that he could lift ten pounds frequently and ten pounds occasionally, and could stand and/or walk *at least two hours* in an eight hour workday") (emphasis added). Consequently,

by giving Plaintiff "the full benefit of the doubt [and] limiting her to the light level of exertion" with no additional restrictions, the ALJ implicitly rejected Dr. Rowley's and Dr. Reid's consultative opinions. (*See* R. at 13–14.)  Because the ALJ did not give controlling weight to Dr. Early's treating opinions, he was required to explain in his decision the weight he gave to Dr. Rowley's and Dr. Reid's physical RFC assessments and address the factors listed in 20 C.F.R. § 404.1527(c).  *See Alejandro*, 291 F. Supp. 2d at 515; *see also* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  The ALJ's narrative discussion lacks such an explanation, however.  (*See* R. at 10–15.)

The ALJ's failure to explain the weight given to Dr. Rowley's and Dr. Reid's consultative opinions contravened 20 C.F.R. §§ 404.1527(e)(2)(ii) and 404.1527(c) and was legal error.  *See Webb v. Astrue*, No. CIV.A. No. 408-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar. 2, 2010), *rec. adopted*, 2010 WL 1644697 (N.D. Tex. Apr. 22, 2010) (holding that "the ALJ erred by not . . . specifying the weight he assigned to each [SAMC] opinion").  In addition, by rejecting all of the medical opinion evidence in the record, the ALJ inevitably relied on his own lay interpretation of Plaintiff's medical and other evidence to find that she could perform light work with no additional limitations.  This was also erroneous.  *See Davis v. Astrue*, No. 1: 11 CV–00267–SA–JMV, 2012 WL 6757440, at *5 (N.D. Miss. Nov.6, 2012), *rec. adopted*, 2013 WL 28068 (N.D. Miss. Jan.2, 2013) ("In formulating a claimant's RFC, the ALJ—a layperson—may not substitute his own judgment for that of a physician.") (citing *West v. Sullivan*, 751 F. Supp. 647, 648 (N.D. Tex. 1990) (holding that "the ALJ may not substitute his judgment for that of . . . medical experts.")).

The Court must now consider whether the ALJ's improper evaluation of the SAMCs' opinions—and therefore his rejection of all medical opinion evidence—was harmless.  *Frank*, 326 F.3d at 622 (applying harmless error analysis where the ALJ "seem[ed] to draw his own medical

conclusions from some of the [medical] data, without relying on a medical expert's help");
*Alejandro*, 291 F. Supp. 2d at 515 (harmless error analysis applies to an ALJ's failure to explain the
weight given to SAMCs).  As noted, harmless error exists when it is inconceivable that a different
disability determination would have been reached absent the error.  *Bornette*, 466 F. Supp. 2d at 816.

First, the ALJ's failure to expressly adopt or discuss the weight given to Dr. Rowley's
findings that Plaintiff had no exertional limitations was harmless because it would not have changed
his disability determination.  However, if the ALJ had properly evaluated and even adopted Dr.
Reid's opinions that Plaintiff could walk and stand for at least two hours, could occasionally climb
ramps, stairs, ladders, ropes, scaffolds, and could occasionally balance, stoop, kneel, crouch, and
crawl, he might have imposed some of these exertional and postural limitations into Plaintiff's RFC.
The ALJ might have thereby concluded that Plaintiff could not perform the full range of light work
and would not have relied exclusively on the Grids, but would have solicited VE testimony at step
five to determine Plaintiff's ability to perform specific jobs in the national economy.  *See Rivera*,
2010 WL 711717, at *4; *Yanez*, 2013 WL 4766836, at *8.  Because it is not inconceivable that the
ALJ would have reached a different disability determination had he properly considered Dr. Reid's
opinions, his error was not harmless.  Accordingly, remand is required on this basis as well.[9]

### III.   RECOMMENDATION

The case should be **REVERSED** and **REMANDED** to the Commissioner for further
proceedings.[10]

---

[9]  On remand, the ALJ's proper evaluation and discussion of the medical opinion evidence in determining
Plaintiff's physical RFC will likely affect Plaintiff's remaining issues.  Accordingly, these issues are not addressed.

[10]  Plaintiff has not met her "heavy burden" to prove disability because there are unresolved issues in the
record to be determined on remand.  Her request for disability benefits at this stage of the proceedings should
therefore be denied.

**SO RECOMMENDED** this 6th day of March, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 22 -